UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WAYNE EDELMAN, ET AL.,

       Plaintiffs,

                            CASE NO. 11-10781
v.                                HON. LAWRENCE P. ZATKOFF

CERTIFIED RESTORATION
DRY CLEANING NETWORK, LLC,

       Defendant.
                                         /

**OPINION AND ORDER**

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on March 11, 2011.

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on Plaintiffs' "Motion for Show Cause," pursuant to which they seek a preliminary injunction [dkts 3 & 5]. On February 28, 2011, the Court denied Plaintiffs' request for a temporary restraining order, scheduled a hearing for the parties to present oral argument on Plaintiffs' motion, and ordered the parties to provide additional briefing on whether a preliminary injunction should issue. Defendant's then filed a response brief, in which Plaintiffs' filed a reply. On March 8, 2011, the Court held oral argument on Plaintiffs' motion. At the close of oral argument, the Court took the parties' arguments under advisement. After a thorough review of the parties' respective briefs and papers, as well as their arguments at the hearing, the Court

DENIES Plaintiffs' motion to show cause for preliminary injunction for the reasons set forth below.

## II. BACKGROUND

Defendant, Certified Restoration Drycleaning Network, LLC ("CRDN"), is a franchisor and licensor of a business system based on dry cleaning restoration, in which soft goods (*e.g.*, curtains and clothing) that are damaged by flood or fires are restored. Defendant has entered into agreements to use its business system with franchisees in the U.S., Canada and the United Kingdom. Plaintiffs are similar franchisees that have contracted with Defendant to operate franchises based on Defendant's system. Plaintiffs' customers are primarily insurance companies and restoration contractors.

On September 16, 2002, November 15, 2002, and August 4, 2004 (respectively, the "Nassau Agreement", "Queens Agreement", "Suffolk Agreement") (collectively, the "Franchise Agreements"), Defendant and Plaintiffs entered into the Franchise Agreements for territories located in the greater–New York metropolitan area.[1]

On February 25, 2011, Plaintiffs filed a verified complaint and motion for temporary restraining order and show cause for preliminary injunctive relief. According to Plaintiffs, Defendant intended to unlawfully terminate the Franchise Agreements based upon Plaintiffs' refusal to pay $107,004 by February 26, 2011, amounts to which Plaintiffs assert Defendant is not entitled. With respect to Plaintiffs' request for a temporary restraining order, Plaintiffs' motion sought injunctive relief to maintain the status quo, pending the conclusion of mediation that they requested with the American Arbitration Association. Plaintiffs alleged that the status quo could be

---

[1]On or about August 4, 2004, April 29, 2005, and December 14, 2007, the parties entered into additional agreements, which added territories to the Queens Agreement.

maintained if Defendant was enjoined from collecting upon the $107,004, and from terminating the Franchise Agreements.

On February 28, 2011, the Court denied the motion for temporary restraining order. Shortly after the Court signed the Order denying the temporary restraining order, but prior to that order being entered, Plaintiffs filed a supplemental brief in support of the motion for temporary restraining order. Therein, Plaintiffs notified the Court that Defendant had, in fact, terminated the Franchise Agreements, on and effective as of February 27, 2011. Until filing their reply on March 3, 2011, the Plaintiffs did not otherwise contact the Court regarding the obvious disconnect between the language in the Court's February 28, 2011, Order denying the temporary restraining order (stating that Plaintiffs had not demonstrated that a termination was imminent) and the fact that the terminations had, in fact, been issued by Defendant the prior day.

**A. FRANCHISE AGREEMENTS**

The relevant portions of the Franchise Agreements at issue in the instant motion are Defendant's compliance with section 12 (the termination section) and Plaintiffs' compliance with subsection 2G (hiring one full-time marketing person). Further, Section 15 (the enforcement section) contains the pertinent mediation subsection.

**1. Section 12: Termination**

Subsection 12(B) in the Queens and Nassau Agreements, which uses langauge similar to the Suffolk Agreement, states "We have the right to terminate this Agreement, immediately effective upon delivery of written notice to you." Following this sentence, the Franchise Agreements list four defaults that would satisfy such termination. Subsection 12(B) then continues to list various other reasons that Defendant could terminate the Franchise Agreements:

3

> We also have a right to terminate this Agreement, after delivery of written notice to you, if you fail to cure the condition and/or situation we notify you of within ten (10) days:[2]
>
> 5. You fail to make payment of any amounts due to us and do not pay the due amounts within the above described 10 days of your receipt of our written notice of the failure;
>
> * * *
>
> 17. You fail to comply with any other material provision, warranty, or certification of this Agreement and/or Manuals, and do not correct such non-compliance within 30 days after written notice of the failure to comply is delivered to you.[3]
>
> * * *
>
> Notwithstanding the above stated 10 day notice period, if one of the listed failures or defaults cannot be cured within 10 days, and you promptly commence all reasonable actions to effectuate a cure and diligently pursue those actions to completion, then we will not terminate this Agreement.[4]

**2. Subsection 2.G: Marketing Person Provision**

In addition to the Termination and Enforcement Sections, the Queens and Suffolk Agreements require Plaintiffs to hire at least one marketing person for each territory. Paragraph G of the Queens and Suffolk Agreements state as follows:

> You acknowledge and agree that to secure new customers for the Franchise Business you must hire at least one experienced and full-time, marketing person.

The Nassau Agreement does not require Plaintiffs to hire a full-time marketing person.

**3. Section 15: Enforcement/Mediation Subsection**

---

[2] This language is absent from the Suffolk Agreement.

[3] This default is listed as number 16 in the Queens Agreement, wherein it provides for a 10-day cure period, as opposed to the 30-day period in the Suffolk and Nassau Agreements.

[4] All of the Agreements contain this paragraph at the end of Section 12. The Nassau and Queens Agreements use the term "competition" rather than "completion". This, however, appears nonsensical. The Suffolk Agreement indirectly points this out by use of the term "completion."

Each of the Franchise Agreements contain the same mediation subsection that reads as follows:

> Except for any controversy or claim relating to the improper or unauthorized use or ownership of the Marks, the breach of non-competition covenants, or the disclosure or improper or unauthorized use of confidential or proprietary information by you, all controversies, disputes, or claims between us and our shareholders, officers, directors, agents, and employees, and you, arising out of or related to:
>
> 1. this Agreement or any other agreement between you and us or any provision of any of these agreements
>
> 2. our relationship with you;
>
> 3. the validity of this Agreement or any other agreement between you and us or any provision of any of those agreements;
>
> 4. any System Standard relating to the establishment or operation of the Franchised Business;
>
> will be submitted for non-binding mediation, on demand of either party, to the office of the American Arbitration Association closest to our then existing principal business address. . . .
>
> You and we promise to use our best efforts to resolve any and all disputes through mediation, on a mutually agreeable basis. Notwithstanding these best efforts and the help of the mediator, [sic] we are unable to resolve a dispute, then either party may initiate litigation as provided in this Section.

Absent from this subsection and any other section of the Franchise Agreements, is any provision that provides for a stay or standstill regarding the parties' rights during the period in which the mediation is conducted.

### B. RELEVANT COMMUNICATIONS BETWEEN THE PARTIES

The parties engaged in a series of written communications spanning almost five months regarding Plaintiffs' purported defaults under the Franchise Agreements before the Franchise

Agreements were ultimately terminated by Defendant on February 27, 2011.

### 1. October 19, 2010, letter from Defendant

On October 19, 2010, Defendant advised Plaintiffs in writing of their failure to hire a full-time marketing person as required under the terms of the Queens and Suffolk Agreements. The October 19, 2010, letter, which was titled "Notice of Non-Compliance", specifically gave Plaintiffs sixty (60) days within which to cure the default.

### 2. December 14, 2010, letter from Defendant

On December 14, 2010, Defendant again advised Plaintiffs in writing of their failure to hire a full-time marketing person as required under the terms of the Queens and Suffolk Agreements. The December 14, 2010, letter, which was titled "Notice of Default and Opportunity to Cure", specially advised Plaintiffs that:

> This Notice of Default is your final notice that if you do not correct the above referenced non-compliance within thirty (30) days from the date of this letter (January 13, 2011), we will have the right to terminate your Franchise Agreements.

### 3. December 30, 2010, letter from Plaintiffs

On December 30, 2010, Plaintiffs' counsel responded to the December 14, 2010, letter. The letter, which was titled "Demand for Mediation", acknowledged that non-compliance with the full-time marketing person provision was due to the difficulty in "keeping anyone employed in that position." According to Plaintiffs, the difficulty related to competition from another CRDN franchisee in Westchester, New York (not a party to this action). The letter further requested that the parties "activate the dispute resolution provisions of the Sept. 4, 2002 (Nassau) Franchise Agreement §15(F) Mediation."

### 4. January 13, 2011, Letter from Defendant

6

The January 13, 2011, letter, which is titled "Demand for Mediation", responded to Plaintiffs' December 30, 2010, letter and addressed the cross-territorial competition from the Westchester franchisee, as well as Plaintiffs' reasons for their admitted failure to maintain a full-time marketing person for each territory. With respect to cross-territorial competition, Defendant stated such competition was permissible under the Franchise Agreements and that Plaintiffs, themselves, had engaged in similar conduct. With respect to mediation, Defendant advised Plaintiffs that it would comply with the mediation provisions in the Franchise Agreements once the mediation process was formally "activated" by Plaintiffs with the American Arbitration Association.

**5. January 27, 2011, Letter from Defendant**

On January 27, 2011, Defendant advised Plaintiffs of the results of an audit performed on Plaintiffs' franchises in accordance with Section 8 of the Franchise Agreements. In sum, the letter stated that the auditor found that $107,004.21 was due and owing. The $107,004.21 was allocated to the following categories:

| | |
|---|---|
| i.   RestorNet Late Reporting pursuant to Section 2(D): | $21,518.17 |
| ii.  Unreported Gross Sales: | $61,376 |
| iii. Minimum Royalty Owed: | $31,455.52 |
| iv.  Audit Fees pursuant to Section 8(B): | $5,350 |
| v.   Payment Received and Deposited: | ($12,695.48)[5] |

Further, the letter allowed Plaintiffs thirty days to pay the amounts due:

> YOU ARE HEREBY INSTRUCTED TO REMIT PAYMENT TO CRDN IN THE AMOUNT OF $107,004.21 WITHIN THIRTY (30) DAYS FROM THE DATE OF THIS LETTER (ON OR BEFORE FEBRUARY 26, 2011).

---

[5] Defendant received this amount from Plaintiffs for royalties due and credited this amount to the total sum of money due and owing to Defendant.

### 6. February 24, 2011–Plaintiffs Activate Mediation

On February 24, 2011, Plaintiffs formally demanded mediation with the American Arbitration Association. On February 26, 2011, the cure period to pay amounts due and owing under the audit expired and Plaintiffs purportedly failed to pay any amounts due and owing.

### 7. February 27, 2011, Letter from CRDN

On February 27, 2011, Defendant transmitted to Plaintiffs a letter titled "Notice of Termination," which stated that due to (1) Plaintiffs' failure to abide by the marketing person provisions under the Queens and Suffolk Agreements, and (2) Plaintiffs' failure to timely pay amounts due under the audit, Plaintiffs' franchises were terminated immediately.

After transmission of the February 27, 2011, letter, Defendant "locked out" Plaintiffs from the proprietary billing software (which tracked all of their CRDN business), and prevented any entry of new jobs or jobs in the "pipeline." In transmitting the termination letter, counsel for Defendant acknowledged in an e-mail that Defendant was doing so with full knowledge of this action and Plaintiffs' request for injunctive relief from this Court.

## III. LEGAL STANDARD

A court is to consider the following four factors in determining whether a plaintiff is entitled to preliminary injunctive relief:

(1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits;
(2) whether the movant has shown that he or she would suffer irreparable harm if the preliminary relief is not issued;
(3) whether the issuance of a preliminary injunction will not cause substantial harm to third parties; and
(4) whether the public interest would be served by the issuance of a preliminary injunction.

*Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995); *UASCO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 98 (6th Cir. 1982); *Mason Cnty. Med. Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977). The standard for preliminary injunction is not a rigid and comprehensive test, and the four factors are to be balanced, not prerequisites that must be satisfied, but instead "these factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992).

## IV. ANALYSIS

### A. LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs seek to argue that Defendant: (1) wrongly asserts that Plaintiffs have not hired a marketing person for two of their franchises, and (2) improperly seeks royalties that violate applicable law. Plaintiffs further argue that the "notice" required for termination is not specifically defined. Subsections 12(B)(1–4) state that Defendant has "the right to terminate this agreement, immediately upon delivery of written notice to you," while Subsections 12(B)(5–16) state that Defendant also has "a right to terminate this Agreement, after delivery of written notice to you, if you fail to cure the condition and or situation we notify you of within ten (10) days."

Based on these clauses, Plaintiffs argue that only Defendant's February 27, 2011, letter acted as a notice of termination. Once Plaintiffs received this notice, the ten-day period to cure begins, thus it was improper for termination to be immediate (*i.e.*, on February 27, 2011) as Defendant stated. Alternatively, Plaintiffs argue that they satisfied the last paragraph in Section 12(B) by hiring marketing persons and requesting mediation with the American Arbitration Association.

In response, Defendant avers that Plaintiffs were in default under the terms and conditions of the relevant Franchise Agreements. Defendant argues that it properly adhered to the notice of

9

default and termination provisions in the Franchise Agreements and, as such, there is no basis to reinstate the Franchise Agreements while the parties engage in mediation. According to Defendant's interpretation of the mediation subsection, it provides that no litigation by any party can be commenced unless and until the parties have engaged in the mediation process—except for injunctive relief for claims related to trademark infringement or breach of covenants not to compete.

After reviewing the relevant communications between the parties and the Franchise Agreements, the Court has determined it is likely that Defendant properly terminated the Franchise Agreements. First, Defendant properly followed subsections 12(B)(5) and 12(B)(17), which permitted it to then send the February 27, 2011, notice of termination to Plaintiffs.[6] With respect to the audit amounts due and owing, Subsection 12(B)(5) allows termination 10 days after Plaintiffs receive written notice of the amounts that are due. Here, the January 27, 2011, letter acted as written notice to Plaintiffs of the amounts due based upon the audit that was conducted. The letter provided Plaintiffs 30 days to cure the default, rather than the contractual 10-day requirement. The 30-day cure period expired on February 26, 2011. Once the cure period expired without Plaintiffs paying the amounts due, pursuant to section 12(B), Defendant could then send a written notice to Plaintiffs to terminate immediately. Defendant did so on February 27, 2011. The Court finds this was in accordance with subsection 12(B), unless the last paragraph in subsection 12(B) applies, which is discussed below.

Defendant also properly followed the termination procedures with respect to Plaintiffs' failure to hire a marketing person. Subsection 12(B)(17) allows termination if Plaintiffs fail to

---

[6]The Court limits its review to these two subsections because neither party specifically argues any other provisions of subsection 12(B) apply.

comply with any material provision of the Franchise Agreements and do not correct such non-compliance within 30 days after receipt of the written notice. In this instance, the October 19, 2010, letter notified Plaintiffs of their non-compliance with the marketing person provision and gave Plaintiffs 60 days to cure the default.

To the extent that Plaintiffs argue that they satisfy the last paragraph of subsection 12(B), the Court has determined that Plaintiffs are unlikely to show that they have satisfied the last paragraph of subsection 12(B). The last paragraph in subsection 12(B) provides:

> Notwithstanding the above stated 10 days notice period, if one of the listed failures or defaults *cannot be cured in 10 days*, and you *promptly commence all reasonable actions* to effectuate a cure *and diligently pursue* those actions to *completion* [sic], then we will not terminate this agreement.

The only evidence that Plaintiffs point to is: (1) after receipt of two notices of default, they took steps to cure the defaults; (2) their December 30, 2010, letter demanded mediation; and (3) the Plaintiffs ultimately requested mediation with the American Arbitration Association.

However, Plaintiffs were aware since October of 2010 that they were in non-compliance with the marketing person provision in the Queens and Suffolk Agreements. Plaintiffs were reminded of this non-compliance in Defendant's December 14, 2010, letter. Further, the January 13, 2011, letter from Defendant indicated that Plaintiffs needed to request mediation with the American Arbitration Association, not Defendant. Plaintiffs did not request mediation with the American Arbitration Association until February 24, 2011. It also appears from representations made by the parties' attorneys at the hearing that Plaintiff also failed to notify Defendant that they had hired a marketing person until they filed their reply brief. Thus, the Court finds that Plaintiffs have failed to satisfy the last paragraph in section 12.

Moreover, the mediation provisions that both parties agreed to upon entering into the franchisor/franchisee relationship provides that "all controversies, disputes or claims between [Defendant] . . . and [Plaintiffs] arising out" of the Franchise Agreements "will be submitted for non-binding mediation" before either party may initiate litigation.[7] Plaintiffs' disputes over the actual amounts due and owing and the non-compliance with the marketing person provisions is covered by the mediation provisions. Therefore, Plaintiffs are unlikely to succeed in showing that Defendant wrongfully terminated the Franchise Agreements and that this dispute does not have to be submitted to non-binding mediation before this Court may address Plaintiffs' claims. Therefore, Plaintiffs have not established a strong probability of success on the merits.

**B. IRREPARABLE INJURY**

Even if a plaintiff has not established a strong probability of success on the merits, the Court may still issue a preliminary injunction if the plaintiff has "'show[n] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.'" *Gaston Drugs, Inc. v. Metro. Life Ins. Co.*, 823 F.2d 984, 988 n. 2 (6th Cir. 1987) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100 102–05 (6th Cir. 1982). The plaintiff's harm is irreparable if "it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see Basicomputer Corp. v. Scott*, 973 F.2d 507, 511–12 (6th Cir. 1992) ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute.").

---

[7] There are three limited exceptions—any claims relating to: (1) ownership of Defendant's trademarks, (2) breach of non-competition covenants, and (3) use of confidential or proprietary information—where mediation is not first required, which neither party has argued applies to Plaintiffs' claims.

12

Plaintiffs argue that they will suffer irreparable injury in the loss of their franchises, associated goodwill with their franchises, and current client base. In contrast, Plaintiffs contend that Defendant will suffer no harm because it will continue to collect royalty fees based on Plaintiffs' client accounts. Defendant does not refute that Plaintiffs will lose their franchises or that it will be unable to continue to collect royalty fees. Here, the Court finds that the harm Plaintiffs would incur from losing their franchises, goodwill, and current client base is not fully compensable by money damages. Thus, this factor weighs in favor of Plaintiffs.

## C. SUBSTANTIAL HARM TO OTHERS

Plaintiffs contend that granting the injunctive relief will result in substantial harm to others. Defendant, however, contends that issuing a preliminary injunction would endorse and allow Plaintiffs to continue to operate their franchises in violation and default of the Franchise Agreements. Defendant concludes that such endorsement would cause harm to them because other Defendant franchisees would seek injunctive relief in the courts, thus bypassing the mediation provisions of the franchise agreements. Notwithstanding Defendant's persuasive contention, this factor is limited to assessing the harm caused to third parties. As such, this factor weighs in favor of neither party.

## D. PUBLIC INTEREST

The Sixth Circuit has determined that the enforcement of contractual covenants is in the public interest, particularly in franchisor and franchisee disputes. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535 (6th Cir. 2007). Plaintiffs contend that reinstating the Franchise Agreements best serves the public interest because it ensures that Defendant will not terminate other franchisees for baseless allegations of non-compliance under the

13

Franchise Agreements. In response, Defendant argues that issuing a preliminary injunction is against the public interest because there is a strong interest in the enforcement of legitimate clauses in contracts. Plaintiffs provide no legal authority to support their contention, and the Court has determined in Subsection IV.A, *supra*, that Defendant's properly followed the termination provisions. Further, the public has a valid interest in ensuring that agreed-upon contractual covenants between two parties are enforced. Therefore, this factor weighs in favor of Defendant.

## V. CONCLUSION

Accordingly, for the reasons set forth above, IT IS HEREBY ORDERED that Plaintiffs' request for a preliminary injunction is DENIED.

IT IS SO ORDERED.

> s/Lawrence P. Zatkoff
> LAWRENCE P. ZATKOFF
> UNITED STATES DISTRICT JUDGE

Dated:  March 11, 2011

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on March 11, 2011.

> s/Marie E. Verlinde
> Case Manager
> (810) 984-3290